OVERSEAS EDUCATION
ASSOCIATION, INC.,
Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

No. 86–1491.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 14, 1987.

Decided Aug. 28, 1987.

Richard J. Hirn, with whom Ronald R. Austin, Washington, D.C., was on the brief, for petitioner.

William E. Persina, Deputy Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol. and Elsa D. Newman, Atty., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent. Pamela P. Johnson and Jill A. Griffin, Attys., Federal Labor Relations Authority, Washington, D.C., also entered appearances for respondent.

Before MIKVA, RUTH BADER GINSBURG and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Concurring opinion filed by Circuit Judge MIKVA, with whom Circuit Judge RUTH BADER GINSBURG joins.

D.H. GINSBURG, Circuit Judge:

The Federal Service Labor-Management Relations Act ("FSLMRA" or "Act"), 5 U.S.C. §§ 7101–7135, requires federal agencies to bargain with unions representing federal employees over the conditions of their employment. 5 U.S.C. § 7103(a)(12). Federal management representatives are required to bargain in good faith over union proposals respecting these conditions unless the subject matter of the proposal is inconsistent with certain reserved management rights specified by statute. Petitioner, the Overseas Education Association, Inc. ("Union"), represented several thousand civilian teachers employed by the Department of Defense Dependents Schools (DoDDS or "the Employer") at secondary schools for dependents of United States military personnel stationed overseas. The Union appeals from a decision of the Federal Labor Relations Authority ("FLRA" or "Authority") that certain proposals it made on behalf of bargaining unit employees were outside the Employer's duty to bargain under the statute. *Overseas Education Association, Inc. and Department of Defense Office of Dependents Schools,* 22 FLRA 351 (1986).

During collective bargaining negotiations, DoDDS refused to bargain over four-

teen Union proposals. The FLRA, upon review of the Department's non-negotiability determination, found seven proposals to be wholly, and one to be partially, non-negotiable. The Authority found the remaining proposals to be negotiable and reversed the Department as to them.

The Union seeks review by this Court of seven of the eight proposals that the FLRA found non-negotiable. We affirm the FLRA for the reasons set out below in connection with each separate proposal. We pause here only to note that our standard of review is deferential to the FLRA. The Act provides that decisions of the FLRA must be made in accordance with section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706. 5 U.S.C. § 7123. Thus, the FLRA's decisions are to be upheld if they are not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* In particular, when the FLRA is construing its enabling legislation, its determinations are to be accorded "considerable deference." *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). More specifically, a negotiability decision will be upheld if the FLRA's construction of the Act is "reasonably defensible." *Department of Defense v. FLRA,* 659 F.2d 1140, 1162 n. 121 (D.C.Cir.1981).

## Proposal No. 2

■ Union Proposal No. 2 is that: Employees who are released from duty without pay to represent the Association shall retain entitlement to all allowances and benefits (including, but not limited to: step increase, insurance, health benefits, [living quarters allowance], post allowances, transportation agreement, teaching position, eligibility for transfer program, retirement credit) for the period of representation unless prohibited by law.

The exception clause in the proposal pays obeisance to 5 U.S.C. § 7117(a)(1), which makes non-negotiable any proposal that would contravene "federal law or any government-wide rule or regulation."

The FLRA concluded that Proposal No. 2, by providing post and living quarters allowances to employees representing the Union while on nonpay status, would conflict with Department of State Standardized Regulations (DSSRs), which govern overseas allowances for civilian employees. As described by the FLRA, the DSSRs "govern allowances, differentials, and defraying of official residence expenses in foreign areas. As to those subjects, they apply to Federal civilian employees generally and are binding on the heads of Agencies." 22 FLRA at 354–55. (footnotes omitted). The FLRA held that because Proposal No. 2 is inconsistent with the DSSRs, and because DSSRs are "government-wide" regulations within the meaning of section 7117(a)(1), the proposal is outside the Employer's duty to bargain. 22 FLRA at 356.

The Union argues on appeal that the FLRA's interpretation of DSSRs as government-wide rules or regulations was "clearly erroneous." Brief of Petitioner at 11. According to the Union, the DSSRs apply only to a "miniscule" segment of the federal civilian workforce—*viz.,* those employed overseas. Out of approximately three million civilian federal employees, the union tells us that only 79,883 were stationed overseas, and moreover, of those stationed overseas, only 22,818 were not employed by the Department of Defense (DOD). Under these circumstances, the Union argues that the DSSRs cannot be interpreted as "government-wide"; they apply to simply too small a fraction of federal employees outside DOD.

We do not agree. We conclude that the FLRA was correct to interpret the DSSRs as government-wide rules or regulations. The DSSRs are facially "government-wide" regulations because they apply to employees of all government agencies who are stationed overseas. The fact that only about 23,000 employees outside DOD may be covered by them at any one moment is irrelevant if any federal civilian employee sent overseas would be subject to them. The FLRA put the test in terms of whether a regulation "is generally applicable

throughout the Federal Government as opposed to applying to every Federal employee," or for that matter to a fixed minimum percentage of the federal civilian workforce. 22 FLRA at 354. Not every federal employee will find every "government-wide" regulation applicable to him or her at any one time, or perhaps ever, but that is of no moment to the question.

In support of its position that the DSSRs are not government-wide, the Union cites Congressman William Ford's statement in the legislative history of the FSLMRA. Congressman Ford said that the Act, by permitting negotiations on matters that are not covered by government-wide rules or regulations, would eliminate "problems such as those which have occurred with overseas schoolteachers." 124 Cong.Rec. 29199 (1978). According to Mr. Ford, the State Department had in some instances issued regulations concerning teachers who were employees of DoDDS. DoDDS then claimed that it could not negotiate over the subject matter of the regulations because it did not issue them, while the Department of State would not negotiate because the Union was not a recognized bargaining agent of State Department employees.

The FLRA found that Mr. Ford's remarks simply misconstrued the DSSRs and were inconsistent with "the overall intent of the Congress." The FLRA here referred to the fact that the DSSRs exercise authority delegated by Congress initially to the President to provide "certain allowances and differentials for civilian employee travel and assignment overseas." 22 FLRA at 354. Some of the statutes authorizing the DSSRs are unquestionably of government-wide application. E.g., Overseas Differentials and Allowances Act, 74 Stat. 792 (1960). We agree that one Congressman's remarks cannot make a government-wide regulation into one that is less than government-wide. If there were persuasive evidence that Mr. Ford's misconstruction of the scope of the DSSRs was the basis on which Congress acted, of course, the FLRA would have to take account of that. The Union has not, however, made such a showing.

The Union also refers us to the legislative history of the Foreign Service Act (FSA) of 1980, which excludes from the definition of negotiable "conditions of employment" matters "relating to Government-wide or multiagency responsibility of the Secretary of State." 22 U.S.C. § 4102(5)(D). The Union argues that the DSSRs are within the latter category excluded from bargaining under the FSA, and were thus not within the exclusion in the FSLMRA for matters subject to government-wide regulation. The Conference Report, H.Rep. No. 96–1432, 96th Cong., 2d Sess. 117 (1980), U.S.Code Cong. & Admin. News 1980, pp. 4419, 4551, refers to "the Uniform Standardized Regulations issued under 5 U.S.C. §§ 5921–25," which provide for various overseas differentials and allowances to be paid to employees of government agencies pursuant to regulations to be prescribed by the President, as an example of a multiagency responsibility. The example cited does not illuminate the distinction between government-wide and multiagency regulations, however, and the Union has done nothing to elaborate on it. Moreover, whatever the intended distinction, because the FSA is a later statute, the relevance of its legislative history is necessarily limited and cannot be dispositive when contradictory to what is otherwise reasonably clear.

Since the FLRA permissibly interpreted the DSSRs to be government-wide regulations, and the conflict between Union Proposal No. 2 and the regulations is manifest, we affirm its holding that the proposal was non-negotiable.

### Proposal No. 4

■ Union Proposal No. 4 is that "any records to which the employee has not been granted access shall not be used to adversely affect said employee." The Union argues that this proposal was intended merely to extend to probationary employees the rights that other employees have under the Civil Service Reform Act (CSRA) when subject to an "adverse action." Brief of Petitioner at 15.

The Authority, however, found that this proposal "is not limited to 'adverse actions' within the meaning of title 5 U.S.C. § 7501 *et seq.*," the section of the CSRA that governs certain agency personnel decisions, such as removal or suspension, as they affect non-probationary employees. 22 FLRA at 359. Instead, it would give all employees—probationers and others alike—unrestricted access to all kinds of records "used in a manner which would affect them in a negative way." *Id.* The FLRA therefore concluded that this proposal in inconsistent with government-wide legal and regulatory restrictions on disclosure of records, such as certain confidential medical information, and records of other employees, and thus is not within the Employer's duty to bargain. 22 FLRA at 359.

The Union's attempt to narrow the significance of its proposal is unpersuasive. If the Union were interested in merely extending to probationers rights now enjoyed by other employees to get information used against them in adverse actions, it could easily have written a proposal that is so limited. The proposal it did write is facially broader than this claimed purpose. If a proposal is facially overbroad in that it includes, along with matters that are negotiable, matters that the Employer cannot lawfully agree to, then the Employer has no obligation to negotiate over it. The fact that the scope of the proposal could be narrowed in the bargaining process is immaterial. The Union should have attempted to bring the proposal within the duty to bargain by narrowing its breadth prior to the bargaining process.

The Authority was certainly reasonable, therefore, in reading Proposal No. 4 as it was written to apply far beyond the context of "adverse actions," as defined by statute. As such, "the proposal makes no allowance for instances where disclosure would be inconsistent with law and Government-wide rule or regulation." *Id.* Ac-

cordingly, we affirm the holding of the FLRA that Proposal No. 4 is not within the Employers' duty to bargain.

### *Proposal No. 5*

■ Proposal No. 5 states:

Unless otherwise mandated by Federal law or government-wide regulations, employees in the bargaining unit will be responsible only to the Employer with respect to matters that affect their terms and conditions of employment.

This proposal "would prevent DoDDS from requiring employees to follow directives given by military personnel" when those employees use "facilities and services which are under the control of the military departments." 22 FLRA at 362. By thus denying the Employer the right to delegate supervision of its employees to the military departments, within their sphere, the FLRA concluded that the proposal was inconsistent with the Employer's statutory right to "direct" employees. § 7106(a)(2)(A).[1] We affirm its holding that the proposal is therefore non-negotiable.

The proposal as written, by making employees "responsible only to the Employer" with respect to the broad range of matters falling within such employees' "terms and conditions of employment," would prevent the Employer from delegating its undoubted statutory rights to "assign" and to "direct" its employees, and to "assign work" to them. Yet the right to direct employees must include the right to direct them to follow the orders of a particular supervisor. Clearly, neither "the agency" nor the agency head can give every direction to every employee without the intermediation of supervisors. Hence, an employee may be directed generally to follow the instructions of a designated supervisor; thereafter that supervisor may exercise the Employer's delegated right to direct the em-

---

1. As the FLRA noted, DoDDS did not give this reason for objecting to Proposal No. 5. The Union therefore argues that the FLRA could not rely upon it under the familiar rule of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). It is absurd to suppose that

that case requires the Authority or a court adjudicating a question of law to order an agency to do that which the law forbids because the agency overlooked the point, and *Chenery* has never been put to so perverse a use.

ployee. There is not the slightest indication in the statute, however, that this authority to direct can be delegated only to supervisors who are also agency employees.[2]

In this case, the employees' supervisors—with respect to base facilities—may be officers of the host entities, the military departments. Apparently DoDDS directs its employees to take instruction from them, at least with regard to some matters, such as the use of those facilities. If it were to agree to Union Proposal No. 5, however, DoDDS could not direct employees to take direction from a military officer with regard to any aspect of that employee's use of a military facility.[3] DoDDS' agreement that an employee need not take direction from military officers would be a clear waiver of its statutory right to direct its employees. That is not permissible under § 7106, and therefore is not bargainable.

*AFGE v. International Council of U.S. Marshals Service*, 11 FLRA (1983) is instructive and close in point. In that case, the Union proposal read: "Employees will not be required to carry out tasks that are not assigned by a supervisor or management official." The FLRA held that this proposal was "inconsistent with management's right *to assign work* under 7106(a)(2)(B) of the Statute." (Emphasis added.) As explicated by the FLRA, the proposal would have interfered with the right to assign work "by preventing the Agency from requiring unit employees serving as marshals, *e.g.*, in Federal courts, to carry out tasks assigned them by judges." In other words, the marshals service's right to "require" employees to do work "assigned by" someone outside the agency itself was reserved by statute and therefore nonnegotiable.

While the focus of that case was on the concept of who may "assign" work to an employee, it could not have arisen if the agency could not also "direct" the employee to accept assignments from someone outside the agency. In general, the right to assign work and the right to direct employees, if not actually interchangeable, will be co-extensive. As a matter of law, expressed in clear statutory language, both rights are made nonnegotiable. As a matter of practicality, both must in some circumstances be delegated outside the employing agency.[4]

The Union says that its concern in making this proposal arose from an incident in

---

**2.** On the contrary, daily government practice—undoubtedly known to the draftsmen—requires that employees occasionally be "detailed" temporarily to other agencies, where they come under the supervision and direction of employees of the host agency; or, more routinely, sent onto the premises of regulated firms and of government contractors, where they come under the direction, within a properly limited sphere, of the private entity that owns the premises; and to international organizations, and state and local governments, and so on, always coming *to some degree* under the direction, by delegation, of the host entity to whose facilities their work assignment takes them.

**3.** Except to the extent that its doing so is redundant because the law already "mandates" that the employee follow the direction of a military officer; for an example, the Union points out that the law requires a DoDDS employee on a military facility to take direction from the base commander with respect to security.

**4.** Our affirmance of the FLRA on this point reflects our understanding that, because DoDDS teachers may live and work on military bases,

DoDDS' right to "direct" employees includes the right to supervise them with respect to the use of military facilities and services when they are not, strictly speaking, performing their teaching duties—a right that it may want or need to delegate to the military. The FLRA, however, in dictum, once defined the right to "direct" as the supervision of employees "in the performance of their duties on the job." *National Treasury Employees Union and Department of the Treasury*, 3 FLRA 769, 775 (1980), aff'd, *National Treasury Employees Union v. Federal Labor Relations Authority*, 691 F.2d 553 (D.C.Cir.1982). The proposal at issue in that case had to do with the criteria to be used by the employer to measure employee job performance. The FLRA's definition of the right to "direct" was inclusive of the facts in NTEU, not exclusive of a broader meaning in a different factual setting. In any event, we accept the FLRA's interpretation of the meaning of the right to "direct" in the case now before us. It is the administering agency's more recent pronouncement about a term not defined by statute or legislative history, and it is entitled to considerable deference by a reviewing court. *Department of Defense v. FLRA*, 659 F.2d at 1162 n. 121.

which a military officer directed teachers living in bachelor officers' quarters to clean the latrines. Brief of Petitioner at 18. The proposal on its face, however, is considerably broader than the type of situation that inspired it, and creates some doubt about the precise nature of the Union's concern. The Union might have drafted a proposal that stated explicitly that employees were not required to undertake manual labor, if that was its concern, regardless of by whom ordered. Or, if the Union was concerned with possible interference by the military with academic curriculum or student discipline, it might have tailored a narrower proposal to address those issues. We have no occasion today, however, to determine whether a proposal that was drawn with reasonable specificity to exclude manual labor from the teachers' duties, or to preclude military interference in the classroom would offend § 7106.

### Proposal Nos. 9, 11, and 12

■ Union Proposal Nos. 9, 11, and 12 would require the employer to give Union representatives who are not DoDDS employees documents requesting use of military facilities and services overseas (Proposal No. 9), reimbursable government travel orders (Proposal No. 11), and access to DOD services and facilities outside the United States (Proposal No. 12). The Union argues that a Department of Defense Directive "explicitly permits base commanders to provide facilities and services, such as quarters, mess and commissary privileges, transportation and emergency hospitalization and medical treatment to nongovernmental agencies and private citizens who aid in the 'accomplishment of the United States government mission' on a reimbursable basis." Brief of Petitioner at 22. The FLRA concluded that these proposals were nonetheless inconsistent with the statutory definition of collective bargaining, which limits the Employer's bargaining obligation to the terms and conditions under which unit employees work. 5 U.S.C. § 7103(a)(12). With regard to Union representatives who are not government employees, it held, DoDDS has no duty to bargain over these proposals.

The Union argued below that these proposals for logistical support of Union agents would enhance the Union's ability to represent its members, in furtherance of the statutory scheme of collective bargaining. On appeal, the Union renews this argument, and adds a somewhat different twist, *viz.*, that "in several isolated locations" lack of this support makes it "difficult, if not impossible" for it to represent its members. Brief of Petitioner at 23. The latter argument is not properly before the Court because it was not advanced below. The former argument was properly rejected by the FLRA; the duty to bargain over matters that affect working conditions certainly does not extend to everything that has an indirect, indeed speculative, effect on working conditions, such as the mere facilitation of Union representation functions. Whether the duty includes an obligation to bargain over such accommodations as may be necessary in isolated locations to make some direct aspect of representation possible, as in a grievance or disciplinary context, is another question, to be left for another day.

### Proposal No. 14

■ Union Proposal No. 14 requires that the Employer "shall take what action it can to provide each [DoDDS] school with a ... Class A telephone," and give employees access to military and civilian telephones at their work site. The FLRA found that, because the telephones would be used for business purposes, the proposal concerned the "technology of performing work" within the meaning of 5 U.S.C. § 7106(b)(1). 22 FLRA at 371. That section provides that the technology, means, and methods of performing work may be negotiated only "at the election of the agency."

We affirm the FLRA. There is no indication whatever that the proposal was intended to be limited to telephones for personal use. Insofar as they are used for government business, the proposal involves bargaining over the means by which work is to be performed, and is nonnegotiable.

As it did with regard to Proposal No. 4, the Union complains that the FLRA failed to provide a narrowing construction so as to make the proposed contract language lawful; instead, the FLRA has shown how the language can be applied to circumstances that would make it unlawful. As with Proposal 4, the Union could have narrowed its proposal in accord with the intention that it ascribes to it. It is for the Union, not the FLRA, to draft proposals that come fully within the Employer's duty to negotiate.

The decision of the FLRA is

*Affirmed.*

MIKVA, Circuit Judge, with whom Circuit Judge RUTH BADER GINSBURG joins, concurring:

We agree that the Federal Labor Relations Authority (FLRA) reasonably determined that these seven proposals proffered by the Overseas Education Association, Inc. (Union) were outside the Department of Defense Dependents Schools' (DoDDS) duty to bargain. We write separately with regard to Proposal 5 to make clear what the court does *not* hold today. A federal agency's non-negotiable statutory right to "direct" employees to heed someone outside the agency does not extend broadly and blindly to every term and condition of employment, regardless of the subject matter involved. The rubric of supervision does not remove in gross all kinds of employment issues from the bargaining table. Specifically, the spectre of military personnel supervising the civilian teachers' academic curriculum or student discipline is a concern over which DoDDS may not refuse to bargain. In our view, a Union proposal that was drawn with reasonable specificity to preclude military interference in the classroom would not offend the agency's "management prerogatives" under the Federal Service Labor-Management Relations Act, 5 U.S.C. § 7106. Of course, Proposal 5 is not so specifically drawn, and because of the Proposal's breadth we are constrained to agree that it impinges on the agency's right to direct the teachers, as that right has been interpreted by the

FLRA in the peculiar circumstances of this case.